**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF LOUISIANA**

| | |
|---|---|
| **DAVID STEWART** | **CIVIL ACTION** |
| **VERSUS** | **NO. 15-1684** |
| **BURL CAIN, WARDEN** | **SECTION "H"(5)** |

**REPORT AND RECOMMENDATION**

This matter was referred to the undersigned United States Magistrate Judge to conduct a hearing, including an evidentiary hearing, if necessary, and to submit proposed findings and recommendations for disposition pursuant to 28 U.S.C. §636(b)(1)(B) and (C), and as applicable, Rule 8(b) of the Rules Governing Section 2254 Cases in the United States District Courts. Upon review of the entire record, the Court has determined that this matter can be disposed of without an evidentiary hearing. *See* 28 U.S.C. § 2254(e)(2). For the following reasons, **IT IS RECOMMENDED** that the petition for *habeas corpus* relief be **DISMISSED WITH PREJUDICE**.

## *I. Procedural history*

Petitioner, David Stewart, is a state prisoner incarcerated in the Louisiana State Penitentiary in Angola, Louisiana. On March 14, 2007, Stewart was charged by bill of information with first-degree robbery in violation of Louisiana Revised Statute 14:64.1.[1] On

[1] State Rec., Vol. 1 of 9, Bill of Information. Additionally, in that same bill, Stewart was charged with two counts of possession of narcotics; those charges were eventually dismissed. (Counts 6, 7). *See* State Rec., Vol. 7 of 9, Minute Entry, 12/16/09. The multi-party bill charged that a second individual, Corey Bowles, committed the instant first-degree robbery along with Stewart (Count 1), and that Bowles and a third individual, Stewart Holmes, committed three

October 25, 2007, following a three-day jury trial, he was found guilty of first-degree robbery.[2] His motions for a new trial and for post-verdict judgment of acquittal were both denied. He was sentenced on August 15, 2008 to twenty-five (25) years imprisonment.[3] The State subsequently filed a multiple-offender bill of information.

Stewart immediately appealed his conviction, asserting three assignments of error: (1) he was denied effective assistance of trial counsel when his attorney failed to object to inadmissible hearsay at trial; (2) he was denied effective assistance of trial counsel when he failed to request a jury instruction on accomplice testimony; and (3) the trial court erred by refusing to disqualify a juror.[4] On May 26, 2009, the Louisiana Fifth Circuit Court of Appeal affirmed his conviction and his related writ was denied by the Louisiana Supreme Court.[5]

On June 12, 2009, following a multiple-offender adjudication, the trial court vacated his

---

separate and additional counts of first-degree robbery (Counts 2, 3 and 4). Count 5 involved only Holmes. Bowles and Holmes ultimately pleaded guilty. Their convictions are not at issue.

[2] State Rec., Vol. 6 of 9, Trial Transcript, p. 233.

[3] State Rec., Vol. 6 of 9, Transcript of sentencing proceedings, 8/15/08, p. 11.

[4] Juan Labadie was granted permission to withdraw as counsel of record. Stewart retained the law offices of James Williams who subsequently enrolled and represented him for the multiple-offender adjudication and the appeal from his conviction. State Rec., Vol. 1 of 9, Motion to Withdraw, Motion to Enroll, Appellant Brief No. 08-KA-1265 to the Louisiana Fifth Circuit.

[5] *State v. Stewart*, 2008-KA-1265 (La. App. 5th Cir. 5/26/09), 15 So.3d 276, *writ denied*, 2009-K-1407 (La. 3/5/10), 28 So.3d 1003 (copy of opinion at State Rec., Vol. 1 of 9).

original sentence and resentenced Stewart as a third-felony offender to life imprisonment.[6] Stewart pursued a second direct appeal challenging his sentence. The enhanced sentence was affirmed on appeal by the intermediate appellate and Louisiana Supreme Court.[7]

On or about February 7, 2013, Stewart filed an application for post–conviction relief with the state district court.[8] In this application, he raised four grounds for relief: (1) he was denied the right to appeal and/or constructively denied the right to effective appellate counsel on appeal from the multiple bill sentencing; (2) he was denied effective assistance of appellate counsel because counsel failed to challenge the sufficiency of the evidence on appeal; (3) the State failed to produce sufficient evidence to support the conviction; and (4) the bill of indictment was invalid because it did not identify the victim. On March 15, 2013, the district

---

[6] State Rec., Vol. 1 of 9, Minute Entry, 6/12/09. *See also* State Rec., Vol. 7 of 9, Transcript of multiple offender hearing held June 12, 2009.

[7] *State v. Stewart*, 10-KA-389 (La. App. 5th Cir. 5/10/11), 65 So.3d 771, *writ denied*,11-KO-1245 (La. 1/20/12), 78 So.3d 140 (State Rec., Vol. 8 of 9).

[8] State Rec., Vol. 2 of 9, Uniform Application for Post-Conviction Relief. Federal *habeas* courts must apply Louisiana's "mailbox rule" when determining the filing date of a Louisiana state court filing, and therefore such a document is considered "filed" as of the moment the prisoner "placed it in the prison mail system." *Causey v. Cain*, 450 F.3d 601, 607 (5th Cir. 2006). As the State notes, Stewart's application includes a notarized signature page dated May 27, 20<u>10</u>. (Rec. Doc. 8, p. 3 n. 4). The certificate of service is not filled out completely, but bears the year 20<u>12</u>. The application bears a filing date-stamp of February 7, 2013, which is the date Stewart himself references in his memorandum in support. Timeliness is not an issue in the present case. Therefore, the Court will simply use the file-stamp date that appears on the application.

court denied relief.[9] On September 20, 2013, his related writ application in the Louisiana Fifth Circuit Court of Appeal was denied in part as to three of the four claims (claims 1, 3 and 4) that the state district court had rejected on procedural grounds, but granted in limited part and remanded for the state district court to address the merits of claim two.[10] On January 21, 2014, the state district court denied relief finding no merit to the single claim reviewed on remand.[11] On April 29, 2014, the Louisiana Fifth Circuit denied Stewart's related writ application with respect to claim two.[12] His related writ application to the Louisiana Supreme Court raising one ground for relief relating to the denial of claim two was denied on March 6, 2015.[13]

On May 18, 2015, Stewart filed his federal application for *habeas corpus* relief.[14] In his

---

[9] State Rec., Vol. 3 of 9, District Court Order signed March 15, 2013, denying post-conviction relief. On May 30, 2013, the district court denied Stewart's motion to reconsider its previous ruling and corrected an earlier error in the referenced title of Stewart's captioned pleading for clarification. *Id*.

[10] State Rec., Vol. 8 of 9, *State v. Stewart*, 2013-KH-689 (La. App. 5th Cir. 9/20/13) (unpublished writ ruling).

[11] State Rec., Vol. 3 of 9, District Court Order signed January 21, 2014, denying post-conviction relief.

[12] State Rec., Vol. 8 of 9, *State v. Stewart*, 2014-KH-220 (La. App. 5th Cir. 4/29/14) (unpublished writ ruling).

[13] *State ex rel. Stewart v. State*, 2014-KP-1106 (La. 3/6/15), 161 So.3d 9; State Rec., Vol. 9 of 9.

[14] Rec. Doc. 1.

petition, Stewart asserts the following grounds for relief: (1) ineffective assistance of trial counsel for failing to object to the introduction of inadmissible hearsay and failing to request a special jury instruction on accomplice testimony; (2) ineffective assistance of appellate counsel for failing to raise the claim of insufficiency of the evidence on direct appeal; and (3) denial of due process and an impartial jury due to trial court error in denying his motion to remove a biased juror. The State filed a response conceding that the federal application is timely and that Stewart has exhausted his remedies in the state courts. The State contends that the claims should be denied on the merits.[15] Stewart filed a Traverse to the State's response.[16]

## *II. Facts*

On direct appeal, the Louisiana Fifth Circuit Court of Appeal summarized the facts as follows:

> At trial, Corey Bowles testified that, on January 3, 2007, he met his uncle, David Stewart, around lunchtime at Tastee Donuts on the corner of Transcontinental Drive and West Esplanade Avenue in Metairie, Louisiana. Both men went to the restaurant often. David Stewart went to Tastee Donuts almost every day to eat and to play video poker. Stewart knew that the manager kept a lock box with money to pay the video poker winners. On that day, both men needed money so they hatched a plan to rob the donut shop.
>
> Pursuant to their plan, the men returned to Tastee Donuts after dark. They parked in the lot behind the restaurant. Stewart went inside Tastee Donuts, briefly played video poker, and scoped out the restaurant, while Bowles sat in the passenger seat of his truck. They were communicating by cell phones.

---

[15] Rec. Doc. 8.

[16] Rec. Doc. 9.

At trial, another Tastee Donuts customer testified that, on the night of January 3, 2007 a few minutes before the robbery, Stewart, who was playing video poker, received a cell phone call and quickly left the shop. A few minutes later, Bowles, who was dressed all in black, entered the donut shop through the front door. Bowles testified that, as he entered the restaurant, his face was exposed until he pulled a white knit ski-mask down over his face.

Gustavo Aguilar, an employee at Tastee Donuts, and his friend, Brent Thompson, were sitting at a table near the front door of the restaurant. Aguilar testified that he was able to see the robber's face as he entered the restaurant. Aguilar positively identified Bowles as the gunman. Bowles, who had a BB gun in his hand, grabbed Thompson and dragged him toward the back of the restaurant. Aguilar jumped up, went behind the counter, and told the manager, Chris Tujaque, that they were being robbed. Aguilar testified that he went straight out of the restaurant's back door and dialed 911.[17]

When Bowles walked to the kitchen area, he saw that there were four more people there. He panicked, found the lock box,[18] broke it open, grabbed the money, ran out the back door, and began walking toward CVS Pharmacy.[19]

Bowles ran behind a nearby apartment building where Stewart was supposed to pick him up. At 7:57 p.m., Bowles used his cell phone to call Stewart to pick him up. After Stewart picked up Bowles, the men parked in front of Stewart's girlfriend's house, split the money from the robbery,[20] then went their separate ways for a while. Later on, Bowles got a room at Shoney's Inn in Metairie, and

---

[17] Sergeant Joseph Chaisson testified that, at 7:56 p.m. on January 3, 2007, a 911 call was received from "Gustavo."

[18] Lynda Santopadre, the manager of Tastee Donuts, testified that a lock box was kept on top of the safe in the office in the kitchen.

[19] Tujaque testified that, while the robber was in the kitchen, he and the others in the restaurant ran out the front door.

[20] Bowles testified that he got $400.00 and defendant got $800.00. However, Santopadre, the manager, testified that her receipts show that approximately $1,600.00 was taken.

the men spent the night there.

On January 17, 2007, about two weeks after the robbery, Detective David Mascaro of the Jefferson Parish Sheriff's Office (hereinafter "JPSO") questioned Bowles about the robbery. Bowles admitted that he had robbed the Tastee Donuts and three other Metairie fast-food establishments. In his recorded statement, Bowles said that he robbed the Tastee Donuts by himself; however, Detective Mascaro testified that Bowles verbally implicated Stewart in that robbery.

At trial, Bowles testified that he would not say in his recorded statement that his uncle, David Stewart, was involved because he wanted to protect him; however, Detective Mascaro testified that Bowles would not go on tape about his uncle because Bowles was scared and did not know what his uncle would do. One week after Bowles' first statement, JPSO Sergeant John Carroll took another recorded statement from Bowles where he implicated Stewart in the Tastee Donuts robbery.

As part of his investigation, the detective obtained Bowles' and Stewart's cell phone records. The records, which were properly authenticated by company representatives, reflected that, in the hour surrounding the robbery, Bowles called defendant at 7:00 p.m., 7:49 p.m., and 7:57 p.m. Furthermore, the calls at 7:00 p.m. and 7:57 p.m. were each two minutes in duration. The call at 7:49 p.m. was a very short duration, which indicates a very short, dropped, or unanswered call.

Bowles testified that he had pled guilty to four counts of first degree robbery, but had not yet been sentenced. He also testified that the prosecutor had not promised him anything in exchange for his testimony, nor did she tell him he would get a certain sentence if he testified. On October 19, 2007, Bowles gave a statement to his attorney, Gerard Archer, again implicating defendant in the Tastee Donuts robbery.

After the State rested its case, the defense called several alibi witnesses who testified that they saw defendant at a Narcotics Anonymous meeting at St. John's Church on Williams Boulevard in Kenner on the night of the robbery. They all remembered that night because defendant received his five-year sobriety medallion and LSU played in the Sugar Bowl.

> One witness testified that, approximately 8:05 p.m., she saw defendant when she went into the meeting. A second witness testified that she arrived at the meeting at approximately 7:55 p.m., and defendant pulled into the lot at the same time, and they walked into the meeting together. She remembered that defendant was there until 9:30 p.m. when the meeting ended. A third witness testified that he had known defendant, who he referred to as his son, for more than 30 years. Defendant has been living at his house since September of 2005. He recalled seeing defendant at the meeting at approximately 8:15 p.m.
>
> Michelle Wise testified that defendant was her sister-in-law's long-time boyfriend. She remembered that, on the night of January 3, 2007, she was at her sister-in-law's house for a Sugar Bowl party but neither defendant nor his truck was at the house until 9:45 p.m. When he came into the house, he showed everyone his five-year sobriety medallion. After all of the evidence and testimony was presented, the twelve-person jury found defendant guilty as charged of first-degree robbery.[21]

### ***III. Standards of review on the merits***

Title 28 U.S.C. § 2254(d), as amended by The Antiterrorism and Effective Death Penalty Act of 1996 (AEDPA) provides the applicable standard of review:

> An application for a writ of *habeas corpus* on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim–
>
> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
>
> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

---

[21] *State v. Stewart*, 08-KA-1265 (La. App. 5th Cir. 5/26/09), 15 So.3d 276, 278-280 (footnotes in original).

The amendments "modified a federal *habeas* court's role in reviewing state prisoner applications in order to prevent federal *habeas* 'retrials' and to ensure that state-court convictions are given effect to the extent possible under law." *Bell v. Cone*, 535 U.S. 685, 693 (2002).

As to pure questions of fact, factual findings are presumed to be correct and a federal court will give deference to the state court's decision unless it "was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d)(2); *see also* 28 U.S.C. § 2254(e)(1) ("In a proceeding instituted by an application for a writ of *habeas corpus* by a person in custody pursuant to the judgment of a State court, a determination of a factual issue made by a State court shall be presumed to be correct. The applicant shall have the burden of rebutting the presumption of correctness by clear and convincing evidence.").

As to pure questions of law or mixed questions of law and fact, a federal court must defer to the state court's decision on the merits of such a claim unless that decision "was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States." 28 U.S.C. § 2254(d)(1). Courts have held that the "'contrary to' and 'unreasonable application' clauses [of § 2254(d)(1)] have independent meaning." *Bell*, 535 U.S. at 694.

A state-court decision is contrary to clearly established precedent if the state court applies a rule that contradicts the governing law set forth in the United States Supreme Court's

cases or if the state court confronts a set of facts that are materially indistinguishable from a decision of the United States Supreme Court and nevertheless arrives at a result at odds with that precedent. *Williams v. Taylor*, 529 U.S. 362, 405–06 (2000); *Wooten v. Thaler*, 598 F.3d 215, 218 (5th Cir.), *cert. denied*, 131 S.Ct. 294 (2010). An "unreasonable application" of [United States Supreme Court] precedent occurs when a state court "identifies the correct governing legal rule... but unreasonably applies it to the facts of the particular state prisoner's case." *Williams*, 529 U.S. at 407-08; *White v. Woodall*, 134 S.Ct. 1697, 1706 (2014).

It is well-established that "an unreasonable application is different from an incorrect one." *Bell*, 535 U.S. at 694. A state court's merely incorrect application of Supreme Court precedent simply does not warrant *habeas* relief. *Puckett v. Epps*, 641 F.3d 657, 663 (5th Cir.2011) ("Importantly, 'unreasonable' is not the same as 'erroneous' or 'incorrect'; an incorrect application of the law by a state court will nonetheless be affirmed if it is not simultaneously unreasonable."). "[E]ven a strong case for relief does not mean the state court's contrary conclusion was unreasonable" under the AEDPA." *Harrington v. Richter*, 562 U.S. 86 (2011). Section 2254(d) preserves authority to issue the writ in cases where there is "*no possibility* fairminded jurists could disagree that the state court's decision conflicts with [United States Supreme Court] precedents." *Harrington v. Richter*, 562 U.S. at 102 (emphasis added); *see also Renico v. Lett*, 559 U.S. 766, 130 S.Ct. 1855, 1866 (2010) ("AEDPA prevents defendants—and federal courts—from using federal *habeas corpus* review as a vehicle to second-guess the reasonable decisions of state courts.").

### *IV. Analysis*

*A. Claims 1, 2 and 3 – Ineffective assistance of trial and appellate counsel*

Three of Stewart's four claims for relief raise issues of ineffective assistance of counsel during trial and on appeal. He claims that his trial attorney was ineffective for failing to object to the State's introduction of inadmissible hearsay testimony and for failing to request a jury instruction on accomplice testimony. These claims were raised on direct appeal. Although such claims are often relegated to post-conviction review, the Louisiana Fifth Circuit in this case found the evidence sufficient to review the merits of the claims and denied relief. The Louisiana Supreme Court denied his related writ without stated reasons. Stewart also claims that appellate counsel was ineffective for failing to argue on appeal that the evidence was insufficient to support his conviction for first degree robbery. This claim was properly raised and addressed by the state courts on post-conviction review.

The United States Supreme Court has established a two-pronged test for evaluating claims of ineffective assistance of counsel. Specifically, a petitioner seeking relief must demonstrate both that counsel's performance was deficient and that the deficient performance prejudiced his defense. *Strickland v. Washington*, 466 U.S. 668, 697 (1984). A petitioner bears the burden of proof on such a claim and "must demonstrate, by a preponderance of the evidence, that his counsel was ineffective." *Jernigan v. Collins*, 980 F.2d 292, 296 (5th Cir.1993); *see also Clark v. Johnson*, 227 F.3d 273, 284 (5th Cir.2000). If a court finds that a petitioner has made an insufficient showing as to either of the two prongs of inquiry, *i.e.* deficient

performance or actual prejudice, it may dispose of the ineffective-assistance claim without addressing the other prong. *Strickland*, 466 U.S. at 697.

To prevail on the deficiency prong of the *Strickland* test, a petitioner must demonstrate that counsel's conduct failed to meet the constitutional minimum guaranteed by the Sixth Amendment. *See Styron v. Johnson*, 262 F.3d 438, 450 (5th Cir.2001). "Counsel's performance is deficient if it falls below an objective standard of reasonableness." *Little v. Johnson*, 162 F.3d 855, 860 (5th Cir.1998). Analysis of counsel's performance must take into account the reasonableness of counsel's actions in light of all the circumstances. *See Strickland*, 466 U.S. at 689. "[I]t is necessary to 'judge ... counsel's challenged conduct on the facts of the particular case, viewed as of the time of counsel's conduct.'" *Lockhart v. Fretwell*, 506 U.S. 364, 371 (1993) (quoting *Strickland*, 466 U.S. at 690). A petitioner must overcome a strong presumption that the conduct of his counsel falls within a wide range of reasonable representation. *See Crockett v. McCotter*, 796 F.2d 787, 791 (5th Cir.1986); *Mattheson v. King*, 751 F.2d 1432, 1441 (5th Cir.1985).

The appropriate standard for determining prejudice varies slightly depending on whether a petitioner is challenging the actions of trial or appellate counsel. In order to prove prejudice with respect to trial counsel, a petitioner "must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different."*Strickland*, 466 U.S. at 694. In this context, a reasonable probability is "a probability sufficient to undermine confidence in the outcome."*Id*. In making a determination

as to whether prejudice occurred, courts must review the record to determine “the relative role that the alleged trial errors played in the total context of [the] trial.” *Crockett*, 796 F.2d at 793.

To prove prejudice with respect to a claim that appellate counsel was ineffective, a petitioner must show a reasonable probability that he would have prevailed on appeal but for his counsel's deficient representation. *Briseno v. Cockrell*, 274 F.3d 204, 207 (5th Cir.2001); *see also Smith v. Robbins*, 528 U.S. 259, 286 (2000). Therefore, a petitioner must demonstrate a reasonable probability that, if appellate counsel's performance had not been deficient in the manner claimed, the appellate court would have vacated or reversed the trial-court judgment based on the alleged error. *Briseno*, 274 F.3d at 210.

Because the state courts rejected petitioner's ineffective assistance of counsel claims on the merits and because such claims present a mixed question of law and fact, this Court must defer to the state court decision unless it was "contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States." 28 U.S.C. § 2254(d)(1); *Moore v. Cockrell*, 313 F.3d 880, 881 (5th Cir.2002). In fact, the United States Supreme Court has held that, under the AEDPA, federal *habeas corpus* review of ineffective assistance of counsel claims must be "doubly deferential" in order to afford “both the state court and the defense attorney the benefit of the doubt.” *Burt v. Titlow*, 134 S. Ct. 10, 13 (2013) (quoting *Cullen v. Pinholster*, 563 U.S. at 190*).*

With respect to trial counsel, Stewart argues that inadmissible hearsay was introduced

on at least two occasions by the prosecutor at trial, through the testimony of Detective Mascaro, and that defense counsel failed to object in either instance. Stewart claims the first admission of hearsay occurred when Detective Mascaro was allowed to testify about information related to him by Corey Bowles — Stewart's nephew and cohort in crime — regarding cell-phone calls between him and his uncle on the day of the crime. Stewart cites to the following exchange with Detective Mascaro during trial:

> Q. Okay. And you said you went back for a third statement. Explain to the Ladies and Gentlemen why you went to talk to Corey Bowles again, over a month later, about phone records?
>
> A. We obtained the phone records in the investigation, based on information Corey had stated that he had called his uncle prior, just prior to the robbery occurring and after he actually committed the robbery. He said the call that he made prior was to find out if the coast was clear and for his uncle to get out of the business for him to rob it. The second call, he explained, was for him to pick him up after the robbery was completed. Once I did the subpoena for the phone records, I had to meet with Corey to review the records for those specific – I'm sorry, specific times.[22]

Stewart argues that the failure to object prejudiced the defense by allowing the State to supplement and bolster Bowles' vague and imperfect recollection when he was asked earlier on direct examination about the cell-phone calls he made to Stewart around the time of the robbery.[23]

---

[22] State Rec., Vol. 5 of 9, Trial Transcript (October 24, 2007), pp. 282-283.

[23] When asked if he used his phone at all while he was sitting outside, Bowles answered, "I don't remember exactly, but I -- I think I tried call.. -- I don't know if I called him or we were

The second instance occurred when Detective Mascaro testified about Stewart Holmes' out-of-court statement to police regarding the three robberies he confessed to committing with Bowles. Holmes was not a witness at trial. The defense elicited testimony from Bowles on cross-examination earlier during trial with respect to the three robberies that he committed with Holmes and the extent of Holmes' involvement in each of those.[24] Stewart points to the following objectionable exchange later between the prosecutor and Detective Mascaro:

> Q. And after you left him, where did your investigation lead next? Did you – what about the codefendant on the other three robberies? Was he arrested?
>
> A. Yes, he was.
>
> Q. Okay, I believe his name is Stewart Holmes?
>
> A. That is correct.
>
> Q. Okay. Did he give a statement?
>
> A. Yes, he did.
>
> Q. Did he give a statement on the same day that he was arrested, the 17th, as well?
>
> A. Yes.

on the phone at the time, and then basically him saying, Go ahead, you know. It was -- .... Like I say, I just, I don't really remember. We were on the phone that day, and that night." *Id*. at 163.

[24] *Id*. at 191-197.

Q. And did he admit to his involvement in the three robberies, not the Tastee's, but the three robberies?

A. Yes, he did.

Q. And did he admit to his role in the three robberies?

A. Yes, he did.

Q. And did his statement coincide with what Corey Bowles said what his involvement was?

A. Yes.

Q. Okay. And do you have any indication at all that Stewart Holmes was present for the Tastee Donuts robbery?

A. No.

Q. Okay. No one has ever said that to you?

A. No.[25]

Stewart argues that the case against him was built upon the testimony of Corey Bowles, who was the only person to implicate him in the crime. Therefore, his credibility was a key factor in the case. According to Stewart, by allowing the hearsay testimony into evidence without objection, defense counsel essentially bolstered the credibility of Bowles' testimony, which contributed to the guilty verdict in this case.

In rejecting these claims on direct appeal, the Louisiana Fifth Circuit concluded that trial counsel was not ineffective for failing to object to Detective Mascaro's testimony as

---

[25] *Id*. at pp. 277-278.

hearsay. The court of appeal determined that trial counsel's decision was a reasonable and valid trial strategy, and further found that Stewart suffered no prejudice as a result of its admission because the testimony was merely cumulative and corroborative of other evidence.

The court of appeal recognized that defense counsel actually sought to introduce all three of Bowles' out-of-court statements as part of a defense strategy to focus the jurors' attention on the inconsistencies among the statements and attempt to cast doubt on Bowles' testimony at trial. The appellate court set forth the content of the statements and determined that the decision to allow them into evidence was reasonable:

> The record reflects that Corey Bowles gave three recorded statements. In Bowles' first statement, Bowles said that he committed the Tastee Donuts' robbery by himself. Bowles also admitted to committing three other robberies with his friend, Stewart Holmes. Bowles stated that he was the gunman in all of the robberies except one. Bowles stated that he robbed Tastee Donuts because he was there all the time and knew robbing it would be easy. He also stated that he parked his vehicle behind the donut shop, and that he wore all black and used a knit cap he had made into a mask to hide his face.
>
> In his second statement, Bowles admitted that defendant was the "mastermind" behind the robbery. Bowles stated that defendant told him where the lock box was kept. Defendant also drove him to Tastee Donuts, waited outside, told him when to go inside, how to leave through the back door, and picked him up after the robbery. Bowles also said, in that statement, that he got $400.00 and defendant got $800.00 from the Tastee Donuts robbery. When asked why defendant got more money, Bowles responded that defendant owed money to someone. Bowles also admitted that the white ski mask the detective found in a safe was the mask that he wore during the Tastee Donuts robbery.
>
> In his third statement (given to his attorney), Bowles again implicated defendant in the Tastee Donuts' robbery, repeating the substance of his second

statement regarding that robbery. Bowles added that defendant knew that Bowles was going to use a BB gun to commit the robbery.

* * * *

At trial, defense counsel fought to introduce all three of Bowles' recorded statements into evidence. Defense counsel wanted to cast doubt on Bowles' incriminating testimony about defendant. He introduced the statements so the jurors could see the inconsistencies, use their common sense, and doubt Bowles' incriminating testimony.

Defense counsel argued in his closing argument that Bowles committed the first robbery at Tastee Donuts on his own, just like he stated in his first statement. He indicated that Bowles was familiar with Tastee Donuts because he frequented it often and, therefore, did not need defendant's help in robbing it, especially considering that it was a small place. He pointed out that Bowles panicked during that first robbery then realized he needed help to commit the next three robberies.

Defense counsel noted, in his closing argument, that there was an eight-day period with no robberies after the first robbery on January 3, 2007. However, the second, third, and fourth robberies occurred in quick succession: January 11, January 13, and January 17. Defense counsel argued that if Bowles had, in fact, committed the first robbery with defendant, there was no reason to find someone else with whom to commit the other ones. He asserted that, if Bowles had actually committed the first robbery with defendant's help, it made no sense for Bowles to change his plan and use Holmes, another crack addict, as his accomplice. Defense counsel argued that Bowles was lying about defendant's involvement in the hope of receiving a reduced sentence on his first-degree robbery convictions.

In support of his trial strategy, defense counsel successfully moved the court to admit Bowles' first statement to the JPSO and his third statement to his attorney for all purposes, even though the State only wanted to introduce them for record purposes. Additionally, defense counsel had no objection when the State introduced the second statement into evidence. Further, during the cross-examination of Bowles, defense counsel introduced Bowles' second statement as his own exhibit.

The record also indicates that defense counsel cross-examined Bowles

> regarding the discrepancies among his statements. He noted that, in Bowles' first statement, he told the detective he committed the robbery because he needed the money, but in the second statement, Bowles said defendant needed the money. Bowles testified that after the robbery, he and defendant went to defendant's girlfriend's house, stayed outside in the truck, and split the money; however, in his prior statements, he never included that detail.
>
> Under the circumstances, defense counsel's choice to introduce a co-defendant's three inconsistent statements "might be considered sound trial strategy." *State v. Dabney*, 908 So.2d at 63. While opinions may differ on the advisability of such a tactic, hindsight is not the proper perspective for judging the competence of counsel's trial decisions. *State v. Brooks*, 505 So.2d 714, 724 (La.1987), *cert. denied*, 484 U.S. 947, 108 S.Ct. 337, 98 L.Ed.2d 363 (1987). Neither may an attorney's level of representation be determined by whether a particular strategy is successful. *Id*. If an alleged error falls "within the ambit of trial strategy," it does not establish ineffective assistance of counsel. *State v. Gordon*, 00–1013 (La.App. 5 Cir. 11/27/01), 803 So.2d 131, 147, *writs denied*, 02–0362 (La.12/19/02), 833 So.2d 336 and 02–0209 (La.2/14/03), 836 So.2d 134. Here, we cannot say that defendant has overcome the "strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance."[26]

It was reasonable under the circumstances and entirely consistent with defense counsel's admission and use of Bowles' out-of-court statements to raise no objection to Detective Mascaro's above-cited testimony. As the court of appeal reasoned, it was consistent with counsel's strategy to undermine Bowles' credibility by demonstrating to the jury multiple inconsistencies and alterations in his story as it evolved over time with respect to Stewart's involvement. Defense counsel attempted to show that those statements Bowles made on the record initially to police were in fact the only truthful version (*i.e.*, that he alone planned and

[26] *State v. Stewart*, 15 So.3d at 282-83 (footnote in original omitted).

committed the instant robbery), and to create doubt in jurors' minds as to the veracity and intent behind Bowles' additional statements regarding Stewart's participation. It was reasonable as a defense theory to attempt to demonstrate that the other statements Bowles made implicating his uncle, including the ones relating to the substance of two of his phone calls to Stewart, were all self-serving, subjective and untrustworthy. Consistent with his defense strategy, defense counsel sought to establish the incredible nature of Bowles' version with Stewart as the mastermind, lookout and getaway driver. Similarly, his use of Holmes' confessed involvement in the three other robberies was strategically geared to his defense theory, as expressed in closing argument, that Bowles committed the first robbery alone, as he initially told police in a recorded statement, and then realized he needed assistance and turned to Holmes, a fellow friend and drug addict who was similarly in need of money.[27] The defense posited that it would be illogical if Bowles had committed the first robbery with Stewart's help for him to use someone different for the others.

On *habeas* review, this Court must apply the "strong presumption" that counsel's strategy and defense tactics fall "within the wide range of reasonable professional assistance." *Strickland*, 466 U.S. at 690. Indeed, federal *habeas* courts presume that trial strategy is objectively reasonable unless clearly proven otherwise by the petitioner. *Strickland*, 466 U.S. at 689; *Geiger v. Cain*, 540 F.3d 303, 309 (5th Cir.2008). In assessing counsel's performance,

---

[27] *State v. Stewart*, 15 So.3d at 282-83.

a federal *habeas* court must make every effort to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time of trial. *Strickland*, 466 U.S. at 689; *Neal v. Puckett*, 286 F.3d 230, 236–37 (5th Cir. 2002); *Clark v. Johnson*, 227 F.3d 273, 282–83 (5th Cir.2000), *cert. denied*, 531 U.S. 1167 (2001). Notably, "*Strickland* does not guarantee perfect representation, only a reasonably competent attorney." *Harrington*, 562 U.S. at 109 (internal quotation marks omitted) (quoting *Strickland*, 466 U.S. at 687). Although Stewart now questions the defense strategy, he cannot obtain relief based on the mere failure of a reasonable strategy that was consistent with the overall defense. *See Strickland*, 466 U.S. at 689-90. The state court's determination that counsel did not perform deficiently in failing to object was neither unreasonable nor contrary to federal law.

Furthermore, the finding that Stewart failed to show prejudice was not contrary to, or an unreasonable application of, federal law. The court of appeal reasoned that Detective Mascaro's testimony about cell-phone calls made by Bowles to Stewart on the night of the robbery was cumulative and corroborative of other evidence and therefore Stewart was not prejudiced by its admission. Bowles himself testified at trial extensively about their plan to rob Tastee Donuts and the role Stewart played in the robbery. He explained that he and Stewart communicated by cell phone throughout that day and night. Though he only vaguely recalled possibly calling Stewart just before the robbery from outside in his truck, he clearly remembered calling Stewart immediately after the robbery to pick him up. Cell-phone

company representatives also provided testimony about the calls made that day from each phone, including the exact time of the call and the approximate duration. Similarly, the court of appeal reasoned that Detective Mascaro's testimony about Holmes' out-of-court statements was cumulative and corroborative of Bowles' testimony. Bowles implicated Holmes in three subsequent robberies, but explained that Holmes was not involved in the one at issue. Consequently, the hearsay was cumulative and its exclusion was not likely to have changed the result.

Additionally, given Bowles' testimony implicating Stewart and detailing his involvement and participation, and the corroborative testimony of two eyewitnesses who placed Stewart at the scene of the crime just before the robbery occurred, and the testimony of cell-phone company representatives who extensively detailed the phone records of Bowles and Stewart on the day of the robbery, the two objectionable references did not contribute to the jury's verdict. Thus, even if these portions of Detective Mascaro's testimony constituted hearsay, Stewart experienced no prejudice from its admission. Stewart fails to demonstrate that the state court unreasonably rejected his claim of ineffective assistance of trial counsel for failing to object to hearsay.

Stewart next claims that his trial counsel was ineffective in failing to request a special jury instruction on the suspect nature of an accomplice's testimony. Under Louisiana law, a trial judge is to instruct the jury to treat with caution the uncorroborated testimony of an accomplice. *State v. Schaffner*, 398 So.2d 1032, 1035 (La.1981); *State v. Murray*, 375 So.2d 80,

88 (La.1979). However, "[w]here there is material corroboration of the accomplice's testimony, the cautionary accomplice instruction is not required." *Schaffner*, 398 So.2d at 1035; *Murray*, 375 So.2d at 88. Material corroboration refers to "evidence that confirms material points in an accomplice's tale, and confirms the defendant's identity and some relationship to the situation." *Schaffner*, 398 So.2d at 1035.

The Louisiana Fifth Circuit rejected the claim on direct appeal, finding that no special charge was necessary in this instance where there was material corroboration of Bowles' testimony based on the following facts:

> In the instant case, Bowles' testimony was materially corroborated by numerous witnesses. Bowles testified that, just before the robbery, he and defendant went to Tastee Donuts. When they arrived, defendant went inside to assess the situation and see if "the coast was clear," while Bowles remained in the truck. Defendant surveyed the scene as he played video poker.
>
> Chris Tujaque, the manager on duty at Tastee Donuts, testified that, on the night of the robbery, two customers were in Tastee Donuts playing video poker: defendant and a woman. Approximately ten minutes before the robbery, Tujaque went out the back door to return a shopping cart to a nearby business. As he walked out the back door, he noticed Bowles sitting in the passenger seat of a truck[28] in the parking lot behind Tastee. Tujaque thought that it was strange that Corey would be sitting outside in the truck on a cold night. After returning the shopping cart, Tujaque was back inside Tastee Donuts between 7:30 and 8:00 p.m. He saw defendant and the woman still playing video poker.
>
> Katherine Pardo, the woman playing video poker next to defendant, testified that defendant received several calls on his cell phone while he played video poker. She remembered that, after one of those calls, defendant got up and left

[28] Tujaque testified it was defendant's truck; however, Bowles testified that he was in his truck.

> very hurriedly, which she thought was unusual. A short while later, the robbery occurred.[29] Tujaque testified that defendant was not present during the robbery.
>
> Bowles also testified that he and defendant communicated many times on January 3, 2007 using their cell phones. Representatives of two cell phone companies showed that there were approximately 44 calls between Bowles and defendant on the day of the robbery. The records specifically showed that Bowles called defendant at 7:49 p.m., a few minutes before the robbery, and at 7:57 p.m., immediately after the robbery. At 7:56 p.m., Gustavo Aguilar reported the robbery in progress to 911.
>
> Bowles testified that defendant told him where the video poker lock box was kept. Several Tastee Donuts employees testified that defendant was in there several times every day, to eat and play video poker. Further, the manager had hired him to do renovation projects, such as putting in the "drive-thru" window. In fact, defendant felt so comfortable at the restaurant that he would walk behind the counter to serve himself or other customers, without the manager's permission. The other witnesses agreed that Bowles did not frequent Tastee Donuts that often.[30]

Additionally, the court of appeal found that the issue of the accomplice's credibility was adequately covered by the trial court's general charge on credibility of witnesses.

The state court's determination is neither contrary to nor an unreasonable application of clearly established federal law. Under the circumstances, it was reasonable for trial counsel not to request a special cautionary jury instruction for accomplice testimony. Stewart fails to

---

[29] *See State v. Schaffner*, *supra*, where the supreme court found that the testimony of the accomplice was materially corroborated, in part, when the police observed defendant walking in the parking lot of the Burger King near the bank, corroborating the accomplice's story that defendant planned to observe him leaving the bank while waiting at a restaurant. *State v. Schaffner*, 398 So.2d at 1035.

[30] *State v. Stewart*, 15 So.3d at 285-286 (footnotes in original).

overcome the strong presumption that defense counsel's performance fell within the range of "reasonable professional assistance," *see Strickland*, 466 U.S. at 689, when he did not request the accomplice testimony instruction.

Furthermore, even if the Court were to assume that counsel performed deficiently in not requesting such an instruction, the omission of the instruction was not so crucial as to undermine confidence in the verdict in this case because (1) the jury was made aware of facts that would have weakened the accomplice's testimony, namely that he was a co-defendant who had already pleaded guilty to the crime, but was not yet sentenced and hoping for leniency[31] and (2) the jurors were instructed generally that it was their duty to determine the credibility of the witnesses, which included weighing the testimony of a witness by, *inter alia*, considering a witness' interest in the case.[32] Therefore, Stewart suffered no prejudice and federal *habeas* relief is not warranted. *See, e.g., Geiger v. Cain*, 540 F.3d 303, 310 (5th Cir. 2008), *cert. denied* 556 U.S. 1188 (2009); *Blue v. Stovall*, Civ. No. 2:06–CV–11164, 2008 WL 82217, at *4 (E.D.Mich. Jan.8, 2008).

Stewart next claims that his appellate counsel was ineffective for failing to challenge the sufficiency of the evidence on direct appeal. According to Stewart, the State's case relied solely on the testimony of an accomplice, Bowles, whose statements were inconsistent,

---

[31] State Rec., Vol. 5 of 9, Trial Transcript, pp. 232-233.

[32] State Rec., Vol. 6 of 9, Trial Transcript, p. 220.

contradictory and unsupported. He contends that Bowles' unsubstantiated and self-serving testimony was outweighed by the testimony of multiple alibi witnesses. This claim was raised in his application for post-conviction relief and rejected by the state courts.

Appellate counsel need not advance every argument, regardless of merit, urged by a petitioner. *Evitts v. Lucey*, 469 U.S. 387, 394 (1985); *see also Jones v. Barnes*, 463 U.S. 745, 751–54 (1983) (an experienced attorney knows the importance of "winnowing out weaker arguments on appeal and focusing on one central issue if possible, or at most on a few key issues")." A brief that raises every colorable issue runs the risk of burying good arguments." *Jones*, 463 U.S. at 753. Furthermore, a showing of prejudice requires that a petitioner establish a reasonable probability that he would have succeeded on appeal but for his counsel's deficient representation. *Briseno v. Cockrell*, 274 F.3d 204, 207 (5th Cir.2001); *United States v. Phillips*, 210 F.3d 345, 350 (5th Cir.2000).

Stewart has advanced nothing to show that a sufficiency-of-the-evidence argument would have been stronger than the arguments that were raised on appeal. Indeed, this Court presumes that appellate counsel exercised his professional judgment to raise the issues on appeal that he considered to be the most meritorious. Regardless, the record demonstrates that there was more than sufficient evidence to support Stewart's conviction, and any such argument appellate counsel might have made in this regard would have been rejected. As the Louisiana Fifth Circuit explained in rejecting the claim of ineffective assistance of appellate counsel on collateral review, the sufficiency claim would not likely have succeeded:

> Relator argued that the evidence presented at trial revealed that he was not actually present during the robbery, that he did not possess the requisite state of mind for the crime charged, and that every reasonable hypotheses of innocence was not excluded. Relator further admitted that the testimony revealed that relator's nephew, Corey Bowles, initially confessed to robbing the Tastee Donut shop by himself or on his own then recanted and implicated relator in the robbery.
>
> * * * *
>
> The district court found that there was ample evidence presented at trial of relator's participation as a principal. In particular, the district court found that the co-defendant informed the jury how relator participated in the commission of the robbery, which included: "scoped out the scene, communicated with Bowles via cell phone, drove the get-away car, and shared the profits."
>
> Further the district court determined that this Court addressed the sufficiency of evidence regarding relator as a principal. *See Stewart*, 08-1265, 15 So.3d at 285-86. Thus the district court concluded that relator failed to establish that he would have been successful had this claim been argued on appeal. Thus, the district court found no deficiency in appellate counsel's performance and no prejudice resulting.[]
>
> * * * *
>
> We find no error in the trial court denial of relator's claim of ineffective assistance of appellate counsel because counsel "need not advance every argument, regardless of merit, urged by the appellant."[33]

As the state courts observed, the Louisiana Fifth Circuit on direct appeal addressed the strength of the evidence, including the fact that other evidence materially corroborated Bowles' testimony, when it considered the accomplice jury charge claim. Given the fact that an appellant challenging the sufficiency of the evidence supporting his conviction faces a very

---

[33] State Rec., Vol. 3 of 9, *State v. Stewart*, 14-KH-220 (La. App. 5th Cir. Apr. 29, 2014).

high bar under Louisiana law, appellate counsel obviously had good reason to omit a challenge to the sufficiency of the evidence. *See State v. Mire*, 2014-2295, 2016 WL 314814 (La. 1/27/16); *State v. Tate*, 01–1658 (La.5/20/03), 851 So.2d 921, *cert. denied*, 541 U.S. 905, 124 S.Ct. 1604, 158 L.Ed.2d 248 (2004); *State v. Turner*, No. 50,221, 2016 WL 231740, at * 2-3 (La. App. 2 Cir. 01/20/16). Even if Stewart's appellate counsel had raised an argument regarding the sufficiency of the evidence at trial, any such argument would have been denied on appeal.

Consequently, Stewart has failed to demonstrate that the state court's decision rejecting his ineffective assistance of trial and appellate counsel claims was contrary to, or involved an unreasonable application of, clearly established federal law, as determined by the Supreme Court of the United States. He is not entitled to relief on these claims.

*B. Claim 4 – Juror Challenge*

Finally, Stewart claims that the trial court violated his Sixth Amendment right to an impartial jury and his Fifth and Fourteenth Amendment rights to due process when it denied his motion to disqualify a juror.[34] Toward the end of the second day of trial, juror Darce informed the trial court that he realized he lived two doors down from the State's witness,

---

[34] On direct appeal, his argument appears to have been based exclusively on Louisiana law (*i.e.*, that the trial judge's denial of the motion to disqualify the juror was an abuse of discretion under state law). The Court notes that claim is a state-law issue, which a federal *habeas* court is powerless to review. *See Estelle v. McGuire*, 502 U.S. 62, 67–68 (1991) ("[I]t is not the province of a federal court to reexamine state-court determinations on state-law questions."). As Stewart's traverse notes, the State has not responded to this claim. The Court will consider only the federal claims raised herein.

Corey Bowles. He told the court that he did not recognize the witness' name or have any association with him or his family, besides the occasional wave or brief "hello." Defense counsel moved for either disqualification of Darce, or preferably a mistrial. After hearing argument by counsel, the trial court had Darce return to the courtroom for further questioning and the following exchange occurred:

> Darce testified that, in 2001, he had moved into his father's house after his divorce. Darce stated that he had talked to Bowles' mother only once or twice in the six or seven years that he had lived on the street. Further, those conversations were after Hurricane Katrina and limited to safety and health issues. Darce said he never spoke to the Bowles' children.
>
> When asked if this affected his feelings about sitting on the jury or changed how he viewed or approached this case, Darce replied that he could still be objective about "everything." Defense counsel asked Darce whether living two doors down from the Bowles' family would affect his thinking, and Darce answered, "I don't owe them anything, so, I mean, I can be as honest and objective as I have to be." After defense counsel completed his questioning of Darce, the prosecutor said she had no further questions. Darce then exited the courtroom.
>
> Although defense counsel did not doubt that Darce was sincere in what he was saying, he still maintained his objection to Darce continuing to serve on the jury. He said that if that information had been elicited during voir dire, that Darce would have been excused for cause. The trial judge then read La.C.Cr.P. art. 797(3) and stated that Darce had no friendship or relationship with the victims or the district attorney.[35] He also pointed out that article 797 did not mention

---

[35] La. C.Cr.P. art. 797 provides, in pertinent part, that the State or the defendant may challenge a juror for cause on the ground that:

> (2) The juror is not impartial, whatever the cause of his partiality. An opinion or impression as to the guilt or innocence of the defendant shall not of itself be sufficient ground of challenge to a juror, if he declares, and the court is satisfied, that he can render an impartial verdict according to the law and the evidence;

> exclusion of witnesses.
>
> The trial judge stated that Darce said he could be fair and that living two doors down from the Bowles' family would not influence him. He noted that Darce did not know Bowles, but had talked to his mother once or twice in six or seven years. The trial judge said it was not reasonable to conclude that that would influence Darce in reaching a verdict. He stated that he thought Darce could judge the credibility of Bowles and that he could perform his oath. Based on those reasons, the trial judge denied the motion to disqualify Darce as a juror and the motion for a mistrial. Defense counsel noted his objection.[36]

Considering the evidence set forth above and applicable state law, the appellate court concluded:

> The law does not require that a jury be composed of individuals who are totally unacquainted with the defendant, the prosecuting witness, the prosecuting attorney, and the witnesses who may testify at trial. Rather, the law requires that jurors be fair and unbiased. *State v. Williams*, 00–1134 (La.App. 5 Cir. 3/28/01), 783 So.2d 566, 567, *citing, State v. Shelton*, 377 So.2d 96, 102 (La.1979).
>
> A juror's disclosure during trial that the juror knows or is related to a witness or the victim is not sufficient to disqualify that juror, unless it is shown that the relationship is sufficient to preclude the juror from arriving at a fair verdict. *State v. Holland*, 544 So.2d 461, 465 (La.App. 2 Cir.1989), *writ denied*, 567 So.2d 93 (La.1990). The connection must be such that one must reasonably conclude that it would influence the juror in arriving at a verdict. *State v. Holland*, 544 So.2d at 465, *citing, State v. Hodgeson*, 305 So.2d 421 (La.1974).
>
> In *State v. Holland*, *supra*, cited by the State in its brief, a juror sent a letter to the

---

(3) The relationship, whether by blood, marriage, employment, friendship, or enmity between the juror and the defendant, the person injured by the offense, the district attorney, or defense counsel, is such that it is reasonable to conclude that it would influence the juror in arriving at a verdict[.]

[36] *State v. Stewart*, 15 So.3d at 287-88 (footnote in original).

trial judge during the trial to inform him that he had just learned he was possibly related to the victim. The juror stated that, even if he was related to the victim, it would not affect him or the process of his decision making and he could be fair and impartial. Defendant challenged the juror for cause. The trial judge denied the challenge and stated that there was nothing to make him conclude that any possible relationship would influence the juror in arriving at a verdict. Defendant objected to the ruling. On appeal, the Second Circuit said that it could not find that the trial judge erred in concluding that the possible relationship, of which the juror was unaware during voir dire, would not prejudice defendant or prevent a fair trial. As such, the Second Circuit found no abuse of the trial judge's discretion in denying the challenge for cause. *Id.*, 544 So.2d at 465–66.

In the instant case, the record reflects that the juror did not know Bowles and did not realize that he lived two doors down from him until Bowles' provided his address during his trial testimony. He only talked to Bowles' mother once or twice in six or seven years. Additionally, the juror said that, even though he lived near Bowles, he could still be honest and objective when viewing this case.

In light of the foregoing, we find no error in the trial judge's finding that it was unreasonable to conclude that this new information would influence the juror in arriving at a verdict. *Holland*, *supra*; *Hodgeson*, *supra*. As such, we cannot say that trial judge abused his discretion by denying defendant's motion to disqualify Darce from serving as a juror in this case.[37]

The Sixth Amendment guarantees the right to an impartial jury. U.S. Const. amend. VI. However, a defendant must show bias on the part of juror; a court will not imply bias. *See Smith v. Phillips*, 455 U.S. 209, 102 S.Ct. 940, 71 L.Ed.2d 78 (1982)."'Preservation of the opportunity to prove actual bias is a guarantee of a defendant's right to an impartial jury.'" *Id*. (quoting *Dennis v. United States*, 339 U.S. 162, 171–72, 70 S.Ct. 519, 94 L.Ed. 734 (1982)). A trial court's finding of non-bias and impartiality of a single juror is a question of fact that is

[37] *State v. Stewart*, 15 So.3d at 288.

accorded the "presumption of correctness" under 28 U.S.C. § 2254(d). *Williams v. Cockrell*, 46 F. App'x 227, 2002 WL 1940099, at *7 (5th Cir. Jul. 25, 2002) (citing *Jones v. Butler*, 864 F.2d 348, 362 (5th Cir.1988) (quoting pre-AEDPA 28 U.S.C. § 2254(d)(8)); *Oliver v. Quarterman*, 541 F.3d 329, 342 (5th Cir.2008); *see also*, *Patton v. Yount*, 467 U.S. 1025, 1036-37 & n. 12 (1984) (under pre-AEDPA law, the state trial court's finding of juror impartiality is entitled to a presumption of correctness).

Here, the trial court allowed Stewart the opportunity to demonstrate impartiality and he failed to do so. Stewart established no proof of any relationship between Darce and Bowles or his family, much less the sort of relationship that would cause juror Darce to be biased or that would influence him in any manner when reaching a verdict. The state court's resolution of this claim was both factually reasonable and in accord with controlling federal principles. Stewart has not shown that denying his motion to disqualify the juror under the circumstances denied him due process of law or the right to a fair and impartial jury. This claim does not warrant *habeas* relief.

**RECOMMENDATION**

**IT IS RECOMMENDED** that Stewart's application for federal *habeas corpus* relief be **DISMISSED WITH PREJUDICE**.

A party's failure to file written objections to the proposed findings, conclusions, and recommendation in a magistrate judge's report and recommendation within fourteen (14) days after being served with a copy shall bar that party, except upon grounds of plain error,

from attacking on appeal the unobjected-to proposed factual findings and legal conclusions accepted by the district court, provided that the party has been served with notice that such consequences will result from a failure to object. 28 U.S.C. § 636(b)(1); *Douglass v. United Services Auto. Ass'n*, 79 F.3d 1415, 1430 (5th Cir.1996) (*en banc*).[38]

New Orleans, Louisiana, this 1st day of April, 2016.

**MICHAEL B. NORTH**
**UNITED STATES MAGISTRATE JUDGE**

[38] *Douglass* referenced the previously applicable ten-day period for the filing of objections. Effective December 1, 2009, 28 U.S.C. § 636(b)(1) was amended to extend that period to fourteen days.